[No. 23014.   *En Banc.*   January 11, 1932.]

CONTINENTAL MUTUAL SAVINGS BANK *et al., Appellants,*
v. JESSIE M. ELLIOTT, *Respondent.*[1]

[1]Reported in 6 P. (2d) 638.

*Tanner & Garvin,* for appellant.

*Byers & Byers* and *Alfred J. Westberg,* for respondent.

MAIN, J.—This action was brought to foreclose a real estate mortgage, and for a deficiency judgment upon the promissory note secured by the mortgage. After the action was instituted, the Washington Mutual Savings Bank was joined as a party plaintiff. The defendants other than Jessie M. Elliott were defaulted, and are no longer involved in this controversy. The trial was to the court without a jury, and resulted in a decree directing the foreclosure of the mortgage, but declining to provide for a deficiency judgment in the event that the property did not sell for enough to satisfy the entire obligation. From this decree, the plaintiffs appeal.

The facts are these: March 16, 1925, the respondent, Jessie M. Elliott, made and delivered to Continental Mutual Savings Bank a note in the sum of fifteen hundred dollars, and, to secure the payment of the same, executed a mortgage covering certain real property then owned by her. June 9, 1927, respondent deeded the mortgaged property to one R. J. Chamberlain, who assumed and agreed to pay the mortgage debt, and, later, entered into a contract for the sale of the same to one William R. Pugsley.

The note became due March 16, 1928. April 2nd of that year, Continental Mutual Savings Bank (the payee of the note), Chamberlain and Pugsley entered into a tri-party agreement, extending the time of the payment until March 16, 1929. The respondent was not a party to this agreement, and testified that she did not know of it until she was served with summons and complaint in this action. The note was not paid when due, and this action was brought upon the debt and to foreclose the mortgage.

The controversy here is over whether the appellants were entitled to a decree which provided for a deficiency judgment. Appellants say that they had a right to such a provision in the decree; respondent contends to the contrary.

The first question is whether the respondent was primarily or secondarily liable upon the note.

Section 3451, Rem. Comp. Stat., which is one of the sections of the negotiable instrument act, provides:

"The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse."

Section 3582 provides:

"The person 'primarily' liable on an instrument is the person who by the terms of the instrument is absolutely required to pay same. All other parties are 'secondarily' liable."

It will be observed that, by the section last quoted, the person primarily liable on an instrument is one who by the terms of the "instrument is absolutely required to pay the same," and all other parties are secondarily liable. By the terms of the promissory note in this case, the respondent is unequivocally required to pay the same, and she therein expressly consented that, in any action brought for the foreclosure of the

mortgage, "a deficiency judgment may be taken for any balance of debt remaining after the application of the proceeds of the mortgaged property." From this, it follows that the respondent's liability on the note was primary and not secondary.

The next question is, how one primarily liable upon a negotiable instrument may be discharged. Section 119 of the negotiable instrument act (Rem. Comp. Stat., § 3509) provides:

"A negotiable instrument is discharged—

"(1) By payment in due course by or on behalf of the principal debtor;

"(2) By payment in due course by the party accommodated, where the instrument is made or accepted for accommodation;

"(3) By the intentional cancellation thereof by the holder;

"(4) By any other act which will discharge a simple contract for the payment of money;

"(5) When the principal debtor becomes the holder of the instrument at or after maturity in his own right."

Section 120 (Rem. Comp. Stat., § 3510) provides:

"A person secondarily liable on the instrument is discharged—

"(1) By any act which discharges the instrument;

"(2) By the intentional cancellation of his signature by the holder;

"(3) By the discharge of a prior party;

"(4) By a valid tender of payment made by a prior party;

"(5) By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved;

"(6) By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against such party is expressly reserved."

It will be observed that, by § 120, subd. 6, an agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the party secondarily liable, or unless the right of recourse against said party is expressly reserved, discharges the instrument. There is no such provision in § 119, and it would necessarily seem to follow that, under that section, the instrument is not discharged by the extension of time. An instrument upon which one is primarily liable can only be discharged under § 119.

Section 29 of the act (Rem. Comp. Stat., § 3420) provides:

"An accommodation party is one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party."

The courts have uniformly held that an accommodation party is primarily liable, and can only be discharged in the manner provided in § 119. The respondent, being the maker of the note and primarily liable thereon, cannot be in any more favorable position with reference to the discharge of the instrument than would an accommodation maker.

In *Union Trust Co. v. McGinty,* 212 Mass. 205, 98 N. E. 679, Ann. Cas. 1913C 525, the court had before it the question of whether an accommodation maker of a promissory note was discharged, if the holder, knowing that the note was made for the accommodation of the payee and indorser, by agreement with the indorser upon a valuable consideration, without the maker's

consent, extended the time of payment; and it was there said:

"Before the enactment of the negotiable instruments act (St. 1898, c. 533, R. L. c. 73, §§ 18-212) one who made a promissory note for the accommodation of another was as between the parties a surety. The holder, who had knowledge of the true relation of the parties, was bound to act toward such accommodation maker as toward a surety in order to preserve his rights against him. Under such circumstances an extension of time to the person ultimately liable, without the consent of the surety, that is the accommodation maker, released the latter. *Guild v. Butler,* 127 Mass. 386, and cases cited at 389. *Jennings v. Moore,* 189 Mass. 197. The precise point is whether this rule of law has been changed by the negotiable instruments act.

"It is matter of common knowledge that the negotiable instruments act was drafted for the purpose of codifying the law upon the subject of negotiable instruments and making it uniform throughout the country through adoption by the legislatures of the several states and by the Congress of the United States. The design was to obliterate state lines as to the law governing instrumentalities so vital to the conduct of interstate commerce as promissory notes and bills of exchange, to remove the confusion or uncertainty which might arise from conflict of statutes or judicial decisions amongst the several states, and to make plain, certain and general the controlling rules of law. Diversity was to be moulded into uniformity. This act in substance has been adopted by many states. While it does not cover the whole field of negotiable instrument law, it is decisive as to all matters comprehended within its terms. It ought to be interpreted in such a way as to give effect to the beneficent design of the Legislature in passing an act for the promotion of harmony upon an important branch of the law. Simplicity and clearness are ends especially to be sought. The language of the act is to be construed with reference to the object to be attained. Its words are to be given their natural and common meaning, and the prevailing principles of statutory interpretation are to be em-

ployed. Care should be taken to adhere as closely as possible to the obvious meaning of the act, without resort to that which had theretofore been the law of this Commonwealth, unless necessary to dissolve obscurity or doubt, especially in instances where there was a difference in the law in the different states.

''Approaching the act from this point of view, it is apparent that no relation of principal and surety is established or contemplated by any of its sections. It determines the liability of the various parties to the negotiable instrument on the basis of that which is written on the paper. The obligation of all makers, whether for accommodation or otherwise, is to pay to the holder for value according to the terms of the bill or note. Their obligation is primary and absolute. §§ 77, 208. The act makes no provision for the proof of another and different relation than that expressly undertaken and defined by the tenor of the instrument signed. The fact that one is an accommodation maker gives rise to a duty no less or greater or different to the holder for value than that imposed upon a maker who received value. This is expressly provided by the act, even though such holder knew at the time of making that the maker was an accommodation maker. § 46. The act further provides in definite terms that the instrument and hence one primarily liable is discharged in one of five different ways (§ 136), that is, by payment by the principal debtor, or by the party accommodated, by cancellation, by any other act which would discharge a simple contract, and by the principal debtor becoming the owner at or after maturity. There is no mention here of a discharge of an accommodation party by extension of time. But among the ways in which a party secondarily liable may be discharged is (§ 137) an agreement by the holder to extend the time of payment or to postpone his right to enforce the instrument 'unless made with the assent of the party secondarily liable or unless the right of recourse against such party is expressly reserved.' Whatever force might attach to the enumeration of ways in which the instrument and consequently parties primarily liable might be discharged, if this provision stood alone, the

inference arising from the omission of extension of time from such enumeration and its inclusion among the ways in which persons secondarily liable may be discharged, is almost irresistible that the legislature did not intend that persons primarily liable should be discharged in that manner. These two sections standing side by side, both dealing with the subject of discharge of liabilities of parties, the one mentioning, the other not mentioning, extension of time by the holder as a means of working discharge of liability, cannot be treated as accidental or without significance. It is strong proof of a legislative purpose to change the pre-existing law of the Commonwealth. These considerations outweigh the argument adduced from the fact that the 'instrument' rather than 'parties primarily liable' is the language used in § 136 and from the phrase of cl. 4, to the effect that the instrument may be discharged 'by any other act which will discharge a simple contract.' The act establishes a liability on the part of an accommodation maker, which is not affected by an extension of time given by the holder to any other party to the note, even though as between such party and the accommodation maker a different relation may subsist in fact from that appearing on the face of the paper. The result is to render somewhat more rigid the rights of the parties as set forth in the written instrument, and so far as the holder is concerned to establish liability to him upon a firm basis, not easily shaken by parol evidence.''

A large number of other cases might be cited to the same effect, but, as already indicated, the decisions appear to be uniform upon the question.

■ The next question that arises is whether the rule that an instrument, negotiable in form, upon which a party is primarily liable, can be discharged only in one of the ways specified in § 119, is applicable where a mortgagor conveys the property covered by the mortgage, and his grantee expressly assumes and agrees to pay it, and, when it becomes due, the mortgagee extends the time of payment, thereby relieving the mort-

gagor from his obligation as one primarily liable, on the theory that, by the conveyance of the property, the assumption of the mortgage by the grantee, and the extension of the time by the mortgagee, the mortgagor became a surety and only secondarily liable.

In *Peter v. Finzer,* 116 Neb. 380, 217 N. W. 612, 65 A. L. R. 1419, the defendant made and delivered a promissory note, negotiable in form, and, to secure the payment of the same, executed and delivered a real estate mortgage. Subsequently, the mortgaged property was conveyed two or three times, and upon each conveyance the grantee assumed the mortgage indebtedness. Upon maturity of the note evidencing the obligation, without the consent of the defendant, the payee of the note made certain valid agreements as to the extension of time of the maturity of the indebtedness with certain grantees of the property who had previously assumed and agreed to pay the same.

It was there held that the mere fact of the making of a lawful agreement binding upon the holder of a negotiable instrument to extend the time of payment, or postpone the holder's right to enforce such instrument, was not of itself a defense in favor of a person primarily liable thereon who had not consented to the extension agreement. It was there said:

"On the basis of the facts set forth in his answer, the defendant, in the court below, as a matter of law, contended that, where one buys land incumbered by a mortgage debt and, as part of the consideration of purchase, assures the payment thereof, his promise creates a principal obligation which the mortgagee may enforce against him; that the maker of the note and mortgage thereafter, between the parties, sustain the relation of surety only; that a subsequent agreement by the mortgagee and payee with such subsequent grantee, without the assent of the grantor and mortgagor, extending time of payment of the debt,

evidenced by the note and mortgage which has been assumed by such grantee, discharges the maker and mortgagor from all personal liability thereon. This conclusion seems fully supported by the doctrine announced by this court in *Merriam v. Miles,* 54 Neb. 566, determined in 1898.

"The controlling question now presented is, to what extent, if any, has the doctrine thus announced been modified or affected by the provisions of the Nebraska negotiable instruments act adopted, effective August 1, 1905? . . .

"This court is committed to the doctrine that, so far as applicable, the provisions of our negotiable instruments act determine the mutual rights of the immediate parties to the instrument as between themselves. *Bank of Commerce & Savings v. Randell,* 107 Neb. 332.

"Finzer, at its inception, was the sole maker of the instrument in suit.

" 'The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to indorse.' Comp. St. 1922, sec. 4671.

"Section 4801, Comp. St. 1922, provides: 'The person "primarily" liable on an instrument is the person who by the terms of the instrument is absolutely required to pay the same. All other parties are "secondarily" liable.'

"It would seem incontestible that Finzer, by the terms of the instrument in suit, being absolutely required to pay the same, is 'primarily' liable thereon. The language of section 4801, *supra,* affirmatively excludes him from the classification of 'secondarily' liable.

"Article VIII of our negotiable instruments law covers the subject of discharge of negotiable instruments. The first section thereof provides: 'A negotiable instrument is discharged: First. By payment in due course by or on behalf of the principal debtor; Second. By payment in due course by the party accommodated where the instrument is made or accepted for accommodation; Third. By the intentional cancelation thereof by the holder; Fourth. By any other

act which will discharge a simple contract for the payment of money; Fifth. When the principal debtor becomes the holder of the instrument at or after maturity in his own right.' Comp. St. 1922, sec. 4729.

"Applicable to those exclusively who are 'secondarily' liable on negotiable instruments, the second section of article VIII provides: 'A person secondarily liable on the instrument is discharged: First. By any act which discharged the instrument; Second. By the intentional cancelation of his signature by the holder; Third. By the discharge of a prior party; Fourth. By a valid tender of payment made by a prior party; Fifth. By a release of the principal debtor, unless the holder's right of recourse against the party secondarily liable is expressly reserved; Sixth. By any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the person secondarily liable, or unless the right of recourse against such party is expressly reserved.' Comp. St. 1922, sec. 4730.

"It may also be said that the statute under consideration makes no provision for the proof of another and different relation than that expressly undertaken and defined by the tenor of the instrument signed. This act further provides in definite terms that the instrument, and hence one primarily liable, is discharged in one of the five ways set forth in section 4729, Comp. St. 1922, above quoted. There is no mention in this section of a discharge of a person 'primarily' liable by an extension of time. But, among the ways in which a party 'secondarily' liable may be discharged as above set forth, in section 4730, *supra,* is 'any agreement binding upon the holder to extend the time of payment, or to postpone the holder's right to enforce the instrument, unless made with the assent of the person secondarily liable,' etc. Whatever interpretation might be required of section 4729, *supra,* containing an enumeration of the ways in which the instrument, and consequently the parties primarily liable thereon, might be discharged, if this provision stood alone, the inference arising from the omission of extension of time from such enumeration, and its

inclusion among the ways in which parties 'secondarily' liable may be discharged as above set forth in section 4730, *supra,* necessitates and renders irresistible the conclusion that the legislature did not intend that persons primarily liable should be discharged in that manner. Or, in other words, parties to a negotiable instrument primarily liable thereon may be discharged only in the manner provided by statute.

"The conclusion follows that the extension of time set forth in defendant's answer did not constitute a valid defense to the action upon the note in suit, in view of the fact that the defendant was, under the terms of the statute, primarily liable thereon, and that the verdict of the jury and judgment of the district court are not supported by the evidence. This conclusion is, in principle, in full accord with the great weight of authority in other states, as will be seen by the following cases: *Cowan v. Ramsey,* 15 Ariz. 533; *Hall v. Farmers Bank,* 74 Colo. 165; *Fox v. Terre Haute Nat. Bank,* 78 Ind. App. 666; *Niotaze State Bank v. Cooper,* 99 Kan. 731; *First State Bank v. Williams,* 164 Ky. 143; *Vanderford v. Farmers & Mechanics Nat. Bank,* 105 Md. 164; *Jamesson v. Citizens Nat. Bank,* 130 Md. 75; *Hager v. Hagerstown Bank,* 138 Md. 252; *Union Trust Co. v. McGinty,* 212 Mass. 205; *Vernon Center State Bank v. Mangelsen,* 166 Minn. 472, 48 A. L. R. 710; *Richards v. Market Exchange Bank Co.,* 81 Ohio St. 348; *Cleveland Nat. Bank v. Bickel,* 59 Okla. 279; *Oklahoma State Bank v. Seaton,* 69 Okla. 99; *Smith v. Minneapolis Threshing Machine Co.,* 89 Okla. 156; *Cellers v. Meachem,* 49 Or. 186; *Lumbermen's Nat. Bank v. Campbell,* 61 Or. 123; *Murphy v. Panter,* 62 Or. 522; *Farmers State Bank v. Forstrom,* 89 Or. 97; *Graham v. Shepherd,* 136 Tenn. 418; *Clem v. Chapman,* 262 S. W. (Tex. Civ. App.) 168, and 278 S. W. (Tex. Civ. App.) 1114; *Neyland v. Lanier,* 273 S. W. (Tex. Civ. App.) 1022; *Wolstenholme v. Smith,* 34 Utah 300."

There is no distinction between that case and the one now before us, other than the fact that, in the opinion in that case, no mention is made of that pro-

vision in § 58 [Rem. Comp. Stat., § 3449] to the effect that, in the hands of any holder other than a holder in due course, ''a negotiable instrument is subject to the same defenses as if it were non-negotiable. . . .'' Inquiry then must be directed as to the effect of that provision when the action is between the original parties to an instrument, negotiable in form.

In *Vernon Center State Bank v. Mangelsen,* 166 Minn. 472, 208 N. W. 186, 48 A. L. R. 710, the action was upon a promissory note and between the original parties thereto, and it was there said:

''For defendant, reliance is put upon the mandate of sec. 58, N. I. L. (sec. 7101, G. S. 1923): 'In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable.' Plaintiff is not a holder in due course, so it is argued that in its hands the note is subject to all defenses which might be interposed if it were non-negotiable. That argument is prevented of application here by sec. 29 which so clearly limits the defenses of an accommodation maker, as against a holder for value, to those which are open to one primarily liable on the instrument, in this case a co-maker. Section 58 is general in its application, whereas sec. 29 is particular in its stated effect on accommodation paper. So within its limited and particular field the latter controls.''

In *Oklahoma State Bank v. Seaton,* 69 Okla. 99, 170 Pac. 477, after referring to the section of the act which provides that in the hands of any holder, other than a holder in due course, a negotiable instrument is subject to the same defense as if it were non-negotiable, it was said:

''There is some authority supporting the views entertained by the defendants in error (*Fullerton Lbr. Co. v. Snouffer et al.,* 139 Iowa 176, 117 N. W. 50), but the great weight thereof justifies the position that the Negotiable Instruments Act was passed by the legis-

lative body of the state for the sole purpose of establishing a uniform system of law applicable to commercial paper, and that law as expressed in said act is the supreme and exclusive expression of said body, and that all laws in existence at the time same was enacted are superseded thereby.

"In R. C. L. vol. 3, p. 1276, it is said:

" 'Under the Negotiable Instruments Law it may be regarded as well settled that the accommodation maker or acceptor is primarily liable, and is not discharged by any extension of time given to the indorser, drawer or comaker, for whose benefit he became a party to the instrument, without regard to whether the party suing on the instrument is a party thereto as a payee, and had knowledge of the relation subsisting between the accommodation maker and the principal debtor.' "

In *Citizens Bank v. Bowden,* 98 Kan. 140, 157 Pac. 429, the action was based upon a promissory note and between the original parties, and it was there said:

"The uniform negotiable instruments act provides that one who by the terms of a note is absolutely required to pay it is 'primarily liable.' (Gen. Stat. 1909, § 5249.) It mentions an extension of time to the principal as one of the methods by which one who is 'secondarily liable' may be released. (Gen. Stat. 1909, § 5373.) The inference is natural that a comaker of a note, although in fact a surety, can not be discharged in this manner, and this is the view that has generally been taken of the meaning of the statute. (*Bank v. Livermore,* 90 Kan. 395, 397, 398, 133 Pac. 734; Note, 26 L. R. A., n. s., 99; Note, Ann. Cas. 1913C, 527; 2 Daniel on Negotiable Instruments, 6th ed., § 1312, p. 1477; *First State Bank v. Williams,* [Ky. 1915] 175 S. W. 10.) In Iowa it is held that as between the original parties an extension granted to one maker of a note may release another who is in fact his surety, this conclusion being based upon the provision of the uniform act that 'in the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable.' (*Lumber Co. v. Snouffer,* 139 Iowa 176, 117 N. W. 50.) The

arguments on each side of the question are summarized in a recent edition of a standard textbook. (2 Daniel on Negotiable Instruments, 6th ed., § 1312, Note 61.) Uniform statutes on commercial matters will largely fail of their purpose unless their construction shall also be uniform. With the exception noted, all the courts that have passed upon the matter hold that the negotiable instrument act precludes the maker of a note from interposing the defense here invoked, and we adopt that view. No hardship can result from the operation of the rule, once it is established. It merely defines the obligation of one who upon the face of a negotiable instrument assumes unconditional liability. It requires a surety who is unwilling to bind himself, irrespective of any extension granted to a comaker, to refrain from signing a note as one of the makers.''

In *Bradley Engineering and Manufacturing Co. v. Heyburn,* 56 Wash. 628, 106 Pac. 170, 134 Am. St. 1127, it was held that the section of the statute which provides that a note in the hands of any holder other than a holder in due course is subject to the same defenses as if it were non-negotiable, must be construed in connection with other sections of the act restricting the defenses, and refers only to such defenses as are permitted in the act itself and such as are not out of harmony with the defenses recognized in the act. After referring to the rule that had previously been in existence under the decisions to the effect that it could be shown by oral testimony that one who signed a note as maker was in fact a surety, the court said:

''But these cases must henceforth be resolved independently of all decisions based upon the law merchant, notwithstanding the contention of appellant that the negotiable instruments act in no way affects the rights or changes the relation of the original parties to the contract. To sustain his theory that it does not do so, appellant cites section 58 of the law: 'In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same

defenses as if it were non-negotiable . . .' Laws 1899, chap. 149, p. 351, § 58. If this section stood alone, there is reason for appellant's contention; but it is a primary rule of construction that one section of a statute must be considered with reference to others, so that the legislative intent may not be defeated. Looking, then, to the whole law and not to the particular section, we find that it is also declared:

" 'Sec. 29. An accommodation party is one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Such a person is liable on the instrument to a holder for value, notwithstanding such holder at the time of taking the instrument knew him to be only an accommodation party.'

" 'Sec. 60. The maker of a negotiable instrument by making it engages that he will pay it according to its tenor, and admits the existence of the payee and his then capacity to endorse.'

"When construed in the light of these sections, section 58 cannot be made to bear the construction put upon it by appellant. The law further provides:

" 'Sec. 26. Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time.'

" 'Sec. 52. A holder in due course is a holder who has taken the instrument under the following conditions: . . .'

" '(3) That he took it in good faith and for value; . . .'

" 'Sec. 59. Every holder is deemed *prima facie* to be a holder in due course; . . .'

"When we consider that it was the object of the negotiable instruments act to make such instrument certain and to speak the true contract of the parties, thus saving the commercial world the hazard of trumped up defenses or the peril of trying out collateral issues such as suretyship, etc., in case of suit, it would seem that we cannot reject the other sections and give effect only to section 58.

"Our conclusion is further fortified by section 192:

'The person "primarily" liable on an instrument is the person who by the terms of the instrument is absolutely required to pay same. All other persons are "secondarily" liable.' This section not only fixes an absolute liability on the one who, by the terms of the instrument, binds himself without qualification, but furnishes a rule of evidence as well. Nor do we think that this construction renders section 58 meaningless. The defenses there referred to must be held to be only such defenses as are permitted by the act itself, or such equities as do not deny the tenor of the bill.''

So far as we are informed, the only case that supports the opposite view is that of *Fullerton Lumber Co. v. Snouffer,* 139 Iowa 176, 117 N. W. 50. In the interest of uniformity, it would seem that the great weight of authority should be followed. Even though the present action was between the original parties to the instrument, the respondent could only be relieved from her obligation thereunder, upon which she was primarily liable, in one of the ways specified in § 119. As already stated, that section makes no provision for discharge by the extension of time of payment.

There are many cases in the books which have applied the rule, to the effect that the conveyance by the mortgagor of property to a grantee who assumes and agrees to pay the mortgage, and the mortgagee extends the time of payment to the grantee, renders the original mortgagor a surety, after the negotiable instruments law had been enacted in the particular state. In none of the cases so holding, however, subsequent to the passage of the negotiable instruments law in the state in which it was rendered, has the decision referred to the law or discussed its provisions. This court, in two cases, *First State Bank of Binford v. Arneson,* 109 Wash. 346, 186 Pac. 889, and *Insley v. Webb,* 122 Wash. 98, 209 Pac. 1093, 41 A. L. R. 274, decided subsequent to the passage of the negotiable

instruments law and the decision in the case of *Bradley Engineering & Manufacturing Company v. Heyburn,* 56 Wash. 628, 106 Pac. 170, 134 Am. St. 1127, applied the rule stated. But in neither of those cases was the action based upon an instrument negotiable in form, and in neither was the negotiable instruments act in any manner referred to. Wherever the act has been mentioned or discussed, it has been held to apply, except in the one case from the state of Iowa, above mentioned.

An opinion is not authority for what is not mentioned therein and what does not appear to have been suggested to the court by which the opinion was rendered. *Pue v. Wheeler,* 78 Mont. 516, 255 Pac. 1043; *Moinet v. Burnham, Stoepel & Co.,* 143 Mich. 489, 106 N. W. 1126; *People ex rel. Crabb v. District Court,* 66 Colo. 438, 182 Pac. 5.

It follows, from what has been hereinbefore said, that the respondent's liability was primary, and could only be discharged in one of the ways provided for in § 119; and, since extension of time was not one of the ways in which the instrument could be discharged under that section, she remained liable upon the instrument.

The judgment will be reversed, and the cause remanded to the superior court with directions to enter a judgment as prayed for by the appellant.

PARKER, MITCHELL, HOLCOMB, BEALS, MILLARD, HERMAN, and BEELER, JJ., concur.

TOLMAN, C. J. (dissenting)—Notwithstanding the respectable authorities which seem to support the views of the majority, I am unable to concur therein.

It should be borne in mind that this is not an action at law on a negotiable instrument, but an action in equity to foreclose a mortgage, with legal relief incidental thereto.

While, under our practice, equitable defenses may be presented to actions at law, all the more, when the plaintiff seeks equitable relief, such defenses are to be entertained and favored.

The sections of the negotiable instruments statute quoted by the majority describe legal defenses only, and the statute does not, and was never intended to, prevent equitable defenses to actions on negotiable instruments. In fact, Rem. Comp. Stat., § 3509, relating to the discharge of one primarily liable on such an instrument, by subd. 4 provides that the person primarily liable may be discharged "by any other act which will discharge a simple contract for the payment of money." Thus the legislature, recognizing previous statutes, opened wide the door for the admission of all proper equitable defenses to actions on negotiable instruments. Among such defenses is the defense of equitable estoppel, which is applicable here.

Assuming that (equitable defenses not considered), as between the maker and the holder, respondent, after the sale of the property by her and the assumption of the mortgage debt by her grantee, was still primarily liable to the holder, or on the instrument, yet when, without her knowledge or consent, the holder of the instrument entered into a binding extension agreement with the grantee, it thereby prevented the payment or enforcement of the instrument when due by its terms, which would or might have satisfied the obligation entirely; and by that extension it permitted the grantee to use the property, cause or allow it to deteriorate and lessen in value, and in every way the extension operated against the interests of the maker of the instrument.

Thus by the acts of the holder, which placed the maker in a less favorable position, it became in equity estopped from asserting its legal claim against the

302

respondent as maker. Moreover, when the holder of the instrument dealt with respondent's grantee without her knowledge or consent, it thereby elected to treat the grantee as the person primarily liable, and is now estopped to assert that the respondent is anything more than secondarily liable, which entitles her to a discharge under subd. 6 of Rem. Comp. Stat., § 3510.

Believing that the statute does not bar equitable defenses, but on the contrary clearly recognizes them, and that such a defense was here established, I dissent.